IN THE UNITED STATES DISTRICT COURT

CENTRAL DIVISION, DISTRICT OF UTAH

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:05-CR-148 TS |
| Plaintiff, | : | |
| | | REPORT AND RECOMMENDATION |
| vs. | : | |
| | | JUDGE TED STEWART |
| ADALBERTO AGUILAR-BANUELOS AND JORGE BANUELOS-MARTINEZ, | : | MAGISTRATE JUDGE BROOKE C. WELLS |
| Defendants. | | |

This matter is before the Court on Defendants', Adalberto Aguilar-Banuelos's and Jorge Banuelos-Martinez's, Motion to Suppress. Evidence was taken on September 26, 2005. Both Defendants were present with counsel. Mr. Aguilar-Banuelos was represented by Ronald J. Yengich. Mr. Banuelos-Martinez was represented by Mary Corporon. The Government was represented by Mark Vincent.

Following briefing by the parties, final argument on Defendants' motion was held on December 13, 2005.[1] Based on issues raised during the final argument, supplemental briefing was ordered. The Court has again reviewed the video tape of the

_____

[1] The Court received the transcript from final arguments on February 15, 2005 and proceeded to take the motion under advisement.

1

traffic stop as well as the Spanish to English translation of the audio portion of the video,[2] (Exhibits 1 and 1(a)) and carefully considered the memoranda and other materials submitted by the parties.  Now being fully advised, the Court enters the following Report and Recommendation wherein it is recommended Defendants' Motion to Suppress be denied.


## I.  BACKGROUND

On March 1, 2005, at approximately 5:00 p.m., Utah Highway Patrol (UHP) Trooper Ashton Jeffery (Trooper Jeffery) observed a black Toyota 4Runner traveling eastbound on I-80 near Wanship in Summit County, Utah.  The vehicle did not have a front license plate displayed. (09/26/05 Suppression Hearing Transcript ("Tr.") at 7-11).  From the rear plate, Trooper Jeffery observed the car was registered in California.  (Tr. 8, 10).  Trooper Jeffery consulted a license plate chart dated 1998 provided by the UHP and carried in his patrol car.  The chart indicated California requires a front license plate. (Tr. 8-10, 44-45, 74-75; Exhibit 4).  Trooper Jeffery stopped the vehicle at about mile marker 158, approximately one mile east of Wanship.  (Tr. at 11, 43-44).  During suppression hearing testimony, Trooper Jeffery

_____

[2]  Trooper Jeffery's patrol car was equipped with a video camera which began recording when the Deputy activated his emergency equipment.  The video tape of the stop and of occurrences after the stop was admitted into evidence by stipulation of the parties prior to the suppression hearings. (Government Exhibit ("Exhibit") 1.) The first 11 minutes and 45 seconds of the sound portion of the video were not recorded because the Trooper neglected to turn on the microphone. (Tr. at 66-68).

acknowledged he did not know if the two-plate requirement was
current law in California.  (Tr. at 45-47).

Trooper Jeffery approached the vehicle from the passenger
side.  (Tr. at 11).  He had his right hand on his hip near his
service revolver but never unholstered the firearm.  (Tr. at 52).
As the window was rolled down, the Trooper noted a "strong" and
"overwhelming" odor, like "rotten food" or "body odor" coming
from inside the vehicle.  (Tr. at 12, 53-54).  Based upon his
training and experience, Trooper Jeffery testified he knew strong
odors are used to mask the presence of illegal narcotics.  (Id.)

Because the driver indicated he did not speak English well,
Trooper Jeffery thereafter spoke with the Defendants in Spanish.[3]
(Tr. at 13, 48).  The Trooper asked the driver, later identified
as Adalberto Aguilar-Banuelos (Aguilar), for his driver's
license, vehicle registration and proof of insurance.  (Tr. at
12-14).  Also in the vehicle was a passenger sitting in the right
front seat later identified as Defendant Banuelos-Martinez
(Martinez).  (Tr. at 14).  Defendant Aguilar looked through the
glove box for documents but did not produce any registration
documents or insurance information.  (Tr. at 15).  Defendant
Aguilar stated the car belonged to his uncle Jose Santos in
California.  Neither Defendant produced a driver's license

---

[3]     Trooper Jeffery testified to having an extensive
education in the Spanish language and to having lived in a
Spanish speaking country.  Defendants did not pose any objections
as to the Trooper's Spanish language capabilities or to the
introduction of the Spanish to English translation of the
conversations contained in the video of the stop. (Exhibit 1(a)).
(Tr. at 34).

although Aguilar produced a resident alien card. (Tr. at 15, 20, 24).  Defendant Martinez did not have a driver's license but produced an identification card of some sort.  (Tr. at 24).  While the Defendants were looking for the requested documents, Trooper Jeffery saw a large can of air freshener (Exhibit 3) inside the glove compartment.  (Tr. at 15, 19).  Jeffery testified air freshener is commonly used to mask the odor of narcotics.  (Tr. at 20).  Trooper Jeffery also observed a dashboard flaw consistent with it having been pried open over the air bag compartment, a spot where narcotics can be concealed.  (Tr. at 14, 15 23-24).  When told he was stopped for not displaying a front license plate, Defendant Aguilar produced the vehicle's second license plate from the back seat of the 4Runner.  (Tr. at 50-51).

Trooper Jeffery, who testified to having made hundreds of traffic stops, stated both Defendants were acting "very nervous – more so than the typical person pulled over".[4] (Id. at 15-18).  The passenger, Defendant Martinez, did not make eye contact with Trooper Jeffery or participate in the conversations and looked straight ahead.  (Tr. at 15-18).

---

[4]    The stationary video camera that captured the stop was mounted on the dash of the UHP car and looked toward the rear end of the 4Runner, not into it.  The first eleven and one half minutes of the stop was not audio recorded.  Although the Defendants can be viewed fleeing from the front of the 4Runner, no conclusion can be reached by the Court as to the state of nervousness of either Defendant through review of the video/audio tape.

When asked about travel plans, Defendant Aguilar stated they were coming from Salinas, California and were going to Colorado for five or six days to visit his mother.  (T. 20-21).  Aguilar stated they had just left Salt Lake City where they had stayed at a Motel 8 in the downtown area and had been traveling for about an hour and a half.  (Tr. at 21, 59, 78. 81).  Trooper Jeffery found the travel time odd because in his experience it doesn't take an hour and a half to get from Salt Lake City to the area of the stop; rather it takes about 50 minutes.  (Tr. at 22-23, 60).  The Trooper observed no luggage in the vehicle, a fact he found inconsistent with usual vacation travel.  (Tr. at 23).  Trooper Jeffery conceded he did not know the locations of Motel 8 or Super 8 motels in the Salt Lake City area.  (Tr. at 82).

While the Defendants remained seated in the 4Runner, further roadside investigation conducted through the police vehicle's computer system confirmed the vehicle was registered in California to Jose Banuelos-Santos.  The California title reflected the car as "salvaged." (Tr. at 18, 25-26, 58).  The 4Runner had not been reported as stolen.  (Tr. at 78-79).  Trooper Jeffery testified that salvaged cars are purchased and restored for use in criminal activity.  (Tr. at 26-27).

Trooper Jeffery testified neither occupant could be allowed to drive the 4Runner because neither had a driver's license.  (Tr. at 25).  Options included issuance of a warning ticket for not having a front license plate and no driver's license with subsequent impound of the car followed by an inventory search.

(Id. at 25).  The car's occupants could be driven to the next town to secure a ride.  It would have been impractical to contact the owner to pick up the car as the owner was from another state. (Tr. at 76-77).  At this juncture, the Trooper did not intend to arrest the occupants.  (Id. at 25).  Needing more information to complete required paperwork for a warning ticket, Trooper Jeffery went from his patrol car to the 4Runner, returned both the driver's and passenger's ID cards and requested Defendant Aguilar return with the Trooper to the patrol car to provide the necessary additional information.[5]  (Tr. at 28).  Defendant Aguilar complied; he was patted down for weapons by the Trooper and directed to the front seat of the patrol car. (Tr. at 29). In response to questions posed Defendant Aguilar further detailed his travel plans and relationship with the passenger.  Aguilar stated that Martinez was his friend; he then said cousin. (Id.) The two were going to Fort Collins, Colorado to visit Aguilar's mother for five to six days.  Aguilar stated he worked in a flower shop and Martinez worked in the strawberry fields.  (Tr. at 29).  During this conversation, Defendant Aguilar asked if he could put the second license plate on the front of the car.  (Tr. at 30, 63, 77).

    At this point, Trooper Jeffery suspected possible criminal activity involving illegal immigrants, the possibility of a stolen vehicle and drug activity due to the "totality of the

---

[5]     The record does not reflect what form of ID was given to the Trooper by Defendant Martinez.

circumstances including the behavior of both subjects," "their travel plans, "the many indicators", the odor, the electrical tape, the air freshener and the lack of luggage in the car.[6] (Tr. at 30-31).  Defendant Aguilar was asked if there were drugs in the car.  Aguilar responded "no" to questions about the existence of cocaine and heroin but answered "not in there" concerning marijuana.  (Tr. at 31-32).  Trooper Jeffery asked Aguilar for consent to search the 4Runner.  Defendant Aguilar responded, "Yes, yes."[7]  (Tr. at 32, 38, 79).

Leaving defendant Aguilar in the patrol car, the Trooper returned to the 4Runner to speak with the passenger, Martinez. (Tr. at 32-33).  Martinez was advised of Aguilar's consent to search the 4Runner and did not object.  (Id.)  Both Defendants were directed to stand at the front of the 4Runner while Trooper Jeffery conducted the search.   During the course of the search, the defendants fled together on foot.  (Tr. at 40-41; Exhibit 1). They were arrested approximately 30 minutes later by Summit County Sheriff's deputies.  (Id. at 40).

During the roadside search Trooper Jeffery located approximately two pounds of crystal methamphetamine in a taped compartment behind the spare tire in the rear of the 4Runner.

---

[6]    Although the Trooper included reference to "electrical tape" the record does not reflect he saw electrical tape prior to beginning the search of the car.  (Tr. at 73).

[7]    No audio exists of the conversation related to a request to search the car as the audio malfunctioned.  (Tr. At 79)

(Tr. at 40).  He also found partially eaten chicken or chicken bones, cole slaw and individual items of clothing.  (Tr. at 55).

During an post-arrest interview with Trooper Jeffery, Defendant Martinez said his name was Jorge Benitez.[8] (Tr. at 41).

After arrest and during individual interviews, each defendant was advised in Spanish by Utah Department of Public Safety (DPS) Agent Jeff Plank of his rights pursuant to Miranda. (Tr. at 83-86).  Presumably, the interviews took place at the Summit County jail facility.  Defendant Aguilar initially agreed to speak and told Agent Plank he rented a garage from his aunt in Salinas, California, the 4Runner belonged to his uncle and he had taken it without permission and was headed to Ft. Collins.  (Tr. at 87-88, 90).  Agent Plank acknowledged that in contrast to his own testimony, his partner's report (Discovery document Bates stamped #18) indicated that during the same interview Defendant Aguilar said he had borrowed the 4Runner from his uncle.  (Tr. at 89-90).  Aguilar further stated he may have touched the drug packages when changing a flat tire.  When asked why the Defendants fled, Aguilar stated it was not out of fear of what would be found in the car as he did not know any illegal drugs were there.  Rather, they ran out of fear the police would call "Immigration".  (Tr. at 87).

Defendant Martinez identified himself to DPS Agent Plank as Jorge Banuelos-Benitez.  (Tr. at 88).  Martinez subsequently

---

[8]     The record does not reflect where this interview with Trooper Jeffery occurred or whether Martinez was advised of his Miranda warnings prior to making this statement.

invoked his <u>Miranda</u> rights and declined to answer questions.
(Tr. at 90).

## II.  DISCUSSION

Defendants challenge the initial stop of the 4Runner as
unlawful and their subsequent detention as being without
requisite articulable suspicion that they were engaged in
criminal activity.  They also challenge the search of the 4Runner
as unlawful because it was conducted without a warrant or legal
consent and was the product of the exploitation of prior police
illegality.

Defendant Martinez moved to suppress all statements made by
him during roadside and jail booking conversations for the reason
that he was not given <u>Miranda</u> warnings prior to being engaged in
conversation by police.[9]

The United States concedes defendants each have standing to
challenge the stop of the 4Runner and the subsequent detention
but challenges the standing of each defendant to contest the
subsequent search of the 4Runner.  The United States further
argues valid consent was given for the search.

a.  <u>Initial Stop</u>

"A traffic stop is valid under the Fourth Amendment if the
stop is based on an observed traffic violation or if the police
officer has reasonable articulable suspicion that a traffic or

---

[9]    Although argued orally, Defendant Martinez's motion was
not supported by written motion or legal briefing.

equipment violation has occurred or is occurring." <u>United States v. Botero-Ospina</u>, 71 F.3d 783 (10th Cir. 1995).

Section 5200 of the California Vehicle Code requires that "When two license plates are issued by the [Department of Motor Vehicles] for use upon a vehicle, they shall be attached to the vehicle for which they were issued, one in the front and the other in the rear." Cal. Vehicle Code § 5200(a)(2000). (Emphasis added); Exhibit 2 at 2. Utah, likewise, requires display of a front and back license plate for the type vehicle in which Defendants were traveling. See Utah Code Annotated § 41-1a-404(1).

UHP Trooper Jeffery stopped the Defendants' California registered 4Runner after observing it traveling without a front license plate. Although not personally aware of California's law regarding display of license plates, Trooper Jeffery consulted a chart dated 1998 provided to him by the UHP which indicated California requires both a front and back license plate displayed on passenger vehicles. A second license plate located inside the 4Runner was later shown to the Trooper by Defendant Aguilar.

Defendants argue Trooper Jeffery's stop of the 4Runner for displaying only a back license plate was unlawful because the Trooper relied on the chart carried in his patrol car and incorrectly presumed California law required <u>all</u> vehicles to display two license plates when it does not.[10] (Emphasis added).

_____

[10]California statute does not require the display of two license plates on some non-passenger vehicles. It is undisputed that the 4Runner was issued a front license plate.

However, the Tenth Circuit has specifically ruled lawful the stop of California registered vehicles that display only one license plate in apparent violation of California law.  See United States v. Ramstad, 308 F.3d 1139 (10th Cir. 2002); (looking at both the California license plate statute and Kansas case law).  See also United States v. McRae, 81 F.3d 1528 (10th Cir. 1996) (involving the Utah stop of a California vehicle).  The validity of such a stop is therefore a matter of settled law and there is no need to independently analyze the stop as an issue of interstate travel. Trooper Jeffery's reliance on the apparent (as well as actual) violation of California law in failing to display two license plates was based on reasonable articulable suspicion.

  b.  Detention

    A routine traffic stop is "characterized as an investigative detention" and a seizure within the meaning of the Fourth Amendment.  U.S. v. Wood, 106 F.3d 942, 945-946 (10th Cir. 1997). The reasonableness of an investigative detention is analyzed under the principles found in Terry v. Ohio, 392 U.S. 1, 19-20 (1968).  A two-part inquiry is required.  First, the Court must determine "whether the officer's action was justified at its inception."  United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir. 1994).  Second, the Court considers "whether the action was reasonably related in scope to the circumstances that first justified the interference."  Id.  "An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation."  Id.

11

see also United States v. Lee, 73 F.3d 1034, 1039 (10th Cir. 1996) ("When the driver has produced a valid license he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.").

After completing these activities, an officer may detain a driver for reasons unrelated to the initial traffic stop if (1) the officer has "an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring[,]" or (2) "if the initial detention has become a consensual encounter." See also Terry, 392 U.S. 1 (1968).

In the instant case, Trooper Jeffery requested the Defendants' driver's licenses, the vehicle registration and proof of insurance. No driver's licenses or vehicle documents were produced. A computer check determined the identification and residence of the registered owner of the vehicle and that the vehicle had not been reported stolen. The Court finds these activities were proper and related to the initial stop. See Gonzalez-Lerma, 14 F.3d at 1483.

The Government cites the following factors in support of Trooper Jeffery's reasonable suspicion of criminal activity warranting continuing detention: the "extreme" nervousness of Defendants; the "strong" and "overwhelming" odor coming from inside the car; the salvaged condition of the 4Runner; the implausible travel story; and the condition of the dash board over the air bag compartment. The government acknowledges none of these factors taken alone may be enough to justify a

reasonable suspicion of narcotics smuggling.  It argues, however, that when looked at "in the totality of the circumstances" as Trooper Jeffery testified he did, the factors justified the reasonable suspicion of illegal conduct warranting further detention.

The Court considers these factors in the order listed above. In the final analysis, however, the question is whether taken as a whole, do the factors support a finding of reasonable suspicion.  See United States v. Arvizu, 534 U.S. 266, 274 (2002); United States v. Fernandez, 18 F.3d 874, 878 (10th Cir. 1994).  The Court cannot simply employ a divide-and-conquer strategy in regard to the listed factors.  As the Supreme Court has admonished, to do so would be legal error.  See Arvizu, 534 U.S. at 274; U.S. v. Santos, 403 F.3d 1120, 1133 (10th Cir. 2005).  Common sense and ordinary human experience are to be employed, see Untied States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994), and deference is to be given for a law enforcement officer's ability to distinguish between innocent and suspicious actions.  See United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir. 2004).  However, inchoate suspicions and unparticularized hunches do not provide reasonable suspicion. See United States v. Fernandez, 18 F.3d 874, 878 (10th Cir. 1994).  "Some facts must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous." Lee, 73 F.3d at 1039; Reid v. Georgia, 448 U.S. 438, 441 (1980).

The factors are:

(1).  As discussed above, the Court found the stop of the 4Runner to be lawful.

(2).  Extreme and continued nervousness is entitled to somewhat more weight than the normal nervousness exhibited by those stopped for a traffic violation.  See U.S. v. West, 219 F.3d 1171, 1179 (10th Cir. 2000).  "Only extraordinary and prolonged nervousness can weigh significantly in the assessment of reasonable suspicion."  Santos, 403 F.3d at 1127.  When viewed in isolation, the nervousness of Defendants as described by Trooper Jeffery, although not readily apparent on the video, would not alone provide the basis for reasonable suspicion.  But, the Court finds their nervousness as testified to by Trooper Jeffery to be a factor for consideration in a "totality of the circumstances" analysis.

(3).  The smell eminating from the interior of the car was strong, overwhelming like "B.O." or rotten food.  Trooper Jeffery testified use of "overwhelming odors" to mask the scent of narcotics is a sign of "drug smuggling."  This includes use of air fresheners.  A can of air freshener was seen in the glove compartment while the Defendants searched for documents.  The origin of the bad odor was never explained.  Defendants argue existence of the foul odor and air freshener should not raise suspicion of criminal activity.  They also argue the air freshener may have been present to cover up the odor of food

located in the 4Runner during the subsequent search.[11]  The smell of masking agents has, however, been recognized as a factor contributing to reasonable suspicion.  See U.S. v. Sanchez-Valderuten, 11 F3d 985 (10th Cir. 1993); U.S. v. Stone, 866 F.2d 359 (10th Cir. 1989).  According to the testimony of the Trooper, each could be a masking agent.  Therefore, the Court finds that while each smell masking factor standing alone does not establish reasonable suspicion of criminal activity, each may be considered individually, in relation to the other and may be weighted with other factors in a "totality of the circumstances" analysis.

(4).   Salvaged Condition of the Vehicle.  Trooper Jeffery testified that based on his training and experience salvaged vehicles can be used in criminal activity because VIN numbers can easily be switched and concealed in reconstructed cars and the value of salvaged cars is less should they be lost to the criminal enterprise.  The court finds this to be a weak factor when considered alone but one to be considered in a "totality of the circumstances" analysis.

(5).   Implausible Travel Plans.  Trooper Jeffery testified he was suspicious when Defendant Aguilar said the two had left Salt Lake City about an hour and a half earlier but were stopped at a location just 50 minutes from the city.  He testified to being further suspicious of the two men claiming to be on a 5-6 day vacation despite having no luggage and only a few items of

--------

[11]This argument doesn't address why one wouldn't just throw out smelly old chicken bones and cole slaw.

clothing in the rear of the 4Runner.  Unlike <u>U.S. v. Bradford</u>, 423 F.3d 1129, 1157-1158 (10th Cir. 2005), where the court found travel plans "defied common sense" as a factor contributing to reasonable articulable suspicion, the travel plans of Aguilar and Martinez do not defy common sense but do constitute a suspicious factor to be considered along with other factors.  The Court finds the lack of luggage but the presence of clothing as only a weak factor.

(6).  Condition of the Dash Board.  Near the beginning of the roadside stop, Trooper Jeffery noticed the damaged condition of the dash board.  He observed pry marks in an area over the air bag compartment where the trooper knew drugs could be concealed. The Court finds this is a suspicious factor to be considered in a "totality of the circumstances" analysis.

(7).  Other Details.  Neither Defendant had a valid driver's license nor were required vehicle registration and insurance documents produced.  These are also factors to be considered.

d.   <u>Totality of the Circumstances</u>

The decisive question is, whether taken as a whole, do the factors offered by the Government support a finding of reasonable suspicion.  <u>See</u> <u>United States v. Arvizu</u>, 534 U.S. 266, 274 (2002); <u>United States v. Fernandez</u>, 18 F.3d 874, 878 (10th Cir. 1994).

In <u>U.S. v. Santos</u>, the 10th Circuit affirmed the denial of a motion to suppress despite the presence of only weak indicators of suspicious behavior.  <u>See</u> 403 F.3d at 1122.

The Court gives deference to the training and experience of Trooper Jeffery.  Based upon the particularized factors present in this case as viewed from the officer's perspective, the Court finds that the factors when taken as a whole support Trooper Jeffery's reasonable suspicion of ongoing criminal activity sufficient to warrant ongoing detention and eventual search of the vehicle.

## II.  Search of the Vehicle

### a.  Standing of Defendants to Challenge Vehicle Search

The United States acknowledges both Defendants Aguilar and Martinez have standing to contest the traffic stop.  See U.S. v. Erwin, 875 F.2d 268 (10th ir. 1989).  However, the United States argues neither defendant has the required standing to contest the subsequent search of the car in which they were driver and passenger because neither had a legitimate possessory interest in the vehicle.

"Fourth Amendment rights are personal and may not be asserted vicariously."  United states v. Hocker, 333 F.3d 1206, 1208 (10th Cir. 2003).  Consequently, in determining if a particular defendant has standing to challenge a search, the court must determine whether a defendant has exhibited a subjective expectation of privacy in the area searched, and whether society is willing to recognize that expectation as being objectively reasonable.  United States v. Rascon, 922 F.2d 584, 586 (10th Cir. 1990).

A defendant bears the burden of showing he had a "legitimate possessory interest in or [a] lawful control over the car." Id. at 1209; see also U.S. v. Nicholson, 144 F.3d 632, 636 (10th Cir. 1998); U.S. v. Soto, 988 F.2d 1548 (10th Cir. 1993). Where the driver of the vehicle is not the registered owner he bears the burden of establishing "that he gained possession from the owner or someone with authority to grant possession." Id; see also U.S. v. Martinez, 983 F.2d 968, 973 (10th Cir. 1992); U.S. v. Arango, 912 F.2d 441, 444-46 (10th Cir. 1990). "Where the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle an standing to challenge the search of the vehicle. United States v. Rubio-Rivera, 917 F.2d 1271, 1275 (10th Cir. 1990). A defendant's testimony is not required to establish the legality of possession where an officer testifies as to what a defendant said and what documentation revealed. See Soto, 988 F.2d at 1553. Further, it is not necessary that a defendant provide documentation establishing he lawfully posses the area searched, rather he must at least state he gained possession from the owner or someone with the authority to grant possession." See Arango at 445.

As argued by the United States, however, fleeing the scene has been cited as a factor to show a lack of possessory interest or lawful control over a vehicle–particularly when the individual flees the scene after being stopped by law enforcement officers."

See e.g. U.S. v. Allen, 235 F.3d 482, 489 (10th Cir. 2000)(Mere presence is not sufficient to show a legitimate possessory interest or lawful control over a vehicle-particularly when the individual flees the scene after being stopped by law enforcement officers).

Here, Defendant Aguilar argues he has met his burden of showing a possessory interest and a reasonable expectation of privacy in the 4Runner.  Aguilar's family name is Banuelos.  Co-defendant Martinez also has the family name of Banuelos.  Aguilar told Agent Jeffery during the initial stop that he had borrowed the 4Runner from his uncle Jose Santos and was traveling from Salinas, California.  Aguilar further told Agent Jeffery he was renting a garage apartment from his aunt in Salina.  A roadside check of the vehicle's registration showed Jose Banuelos-Santos of Salinas, California as the registered owner.   The 4Runner had not been reported stolen.  During a subsequent police interview, Defendant Aguilar purportedly told Agent Plank that he had borrowed the car without his uncle's permission.  The accuracy of this statement is challenged, however, by the report of the agent's partner which was consistent with Aguilar's statement the truck had been taken with permission.  (Emphasis added).   While it is true that both defendants fled from the front of the vehicle during the search, a factor to be taken into account, Aguilar's statement that they ran from fear of immigration repercussions is not implausible nor inconsistent with permission to have the vehicle.  The two were traveling on I-80, the major

west-to-east route between northern California and northern
Colorado.  For the above-stated reasons, the Court finds
Defendant Aguilar has established standing to challenge the
vehicle search.

As to Defendant Martinez, the court also finds he has
standing.  While Defendant Martinez did not argue in his brief or
offer legal support for the proposition that he has established
derivative standing through the statements and actions of his co-
defendant Aguilar, the court accepts that because the two were
from the same town in California, were related and shared the
same family name as the owner of the 4Runner who had not reported
the vehicle stolen, Martinez also has an expectation of privacy
in the vehicle which society is willing to recognize and standing
to challenge the subsequent search of the 4Runner.

b.  Consent to Search the Vehicle

Defendants argue consent to search the 4Runner given by
Defendant Aguilar was the result of the exploitation of prior
police illegality, the illegal detention.  Because the Court has
found there was no illegal detention, it will not analyze
Aguilar's consent pursuant to that theory.

Alternatively, however, "One of the specifically established
exceptions to the requirements of both a warrant and probable
cause is a search that is conducted pursuant to consent."
Schneckloth v. Bustamonte, 412 U.S. 298, 219 (1973) "Whether a
defendant freely and voluntarily consents to a search is a
question of fact determined from the totality of the

circumstances." United States v. Pena-Sarabia, 197 F.3d 983, 986 (10th Cir. 2002).  The government has the burden to prove a valid consent to a warrantless search.  United States v. Cody, 7 F.3d 1523, 1526 (10th Cir. 1993).  A two-part test determines whether consent is given.  The government must first present "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.  Second, the government must show that the police did not coerce the defendant into granting his consent."  United States v. Pena, 143 F.3d 1363, 1365 (10th Cir. 1998); United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001).

Here, the Court finds the government has proved Defendant Aguilar consented to the search of the 4Runner and his consent was both freely and voluntarily given.  The evidence before the Court comes both through the testimony of Trooper Jeffery and review of the video tape.  Both are consistent in that Defendant Aguilar willingly returned with Trooper Jeffery to the patrol car.  Although in uniform, Trooper Jeffery never unholstered his sidearm; the pat down search of Aguilar was conducted appropriately.  Therefore, any show of authority was not impermissibly coercive.  The Trooper directed Aguilar to the passenger seat while taking the driver's seat himself.  See U.S. v. Gigley, 213 F.3d 509, 514 (10th Cir. 2000) (defendant seated in front seat of the patrol car, without more, does not make consent involuntary).  Defendant Aguilar answered "yes, yes" when asked in Spanish for permission to search the 4Runner.  When told

of Aguilar' consent to search the vehicle, Defendant Martinez offered no objection.  Rather, both defendants eventually fled.

There is no evidence before the Court that Aguilar's consent to search was anything but freely and voluntarily given._____

_____   c.   Inevitible Discovery of Drugs during Inventory Search

"The inevitable discovery doctrine provides an exception to the exclusionary rule . . . and permits evidence to be included 'if an independent, lawful police investigation would have inevitably discovered it.'" U.S. v. Cunningham, 413 F.3d 1149, 1203 (10th Cir. 2005).  "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."  Id. (citing U.S. v. Souza, 223 F.3d 1197 (10th Cir. 2003)).  Consequently, if evidence seized unlawfully would have been inevitably discovered in a subsequent inventory search such evidence would be admissible."  U.S. v. Ibarra, 955 F.2d 1405, 1410 (10th Cir. 1992).

The government argues that even assuming *arguendo* that the search of the car was illegal, the drugs would have inevitably been discovered during an inventory search.  Defendants counter that because the drugs were located in a compartment secreted behind the spare tire they would not have been found during the confines of a properly conducted inventory search.  The Court agrees with the United States.

Trooper Jeffery lawfully stopped the defendants for driving without a front license plate.  It was subsequently determined

neither defendant possessed a valid driver's license.  Neither
would have been allowed to drive the vehicle away.  The
registered owner was from out of state and could not have been
immediately available to pick up the 4Runner.  Under these
circumstances, and regardless of whether consent had been given
to search, the vehicle would have been impounded and an inventory
search conducted.  Contrary to Defendants' argument, electrical
duct tape coming from the secreted area containing drugs was seen
from inside the rear portion of the vehicle by the Trooper.  (Tr.
at 73).  The Court finds the government has proved by a
preponderance of the evidence the illegal narcotics would have
been inevitably found in the car through the UHP inventory
search.

### III.  ADMISSIBILITY OF MARTINEZ' STATEMENTS

     At the time of the Suppression Hearing, Defendant Martinez
orally asserted all statements made by him should be suppressed
as having been elicited without having been given <u>Miranda</u>
warnings.  This included giving his name and other identifying
information at the time of the initial traffic stop and at the
Summit County Jail during the booking process.  Martinez did not,
however, submit any written or oral legal argument or support for
this particular position and it is therefore deemed abandoned.
The record does not reflect that defendant Aguilar joined in this
motion.

Rather, as the record clearly reflects, defendant Martinez was interviewed by DPS Agent Plank who is fluent in Spanish. (Tr. at 84).  Agent Plank testified to fully advising Martinez of his constitutional rights pursuant to <u>Miranda</u> in anticipation of questioning about the drugs located in the 4Runner.  Martinez declined to be interviewed and his interview was terminated.

Based upon the evidence before it, the Court finds Defendant Martinez (as well as Defendant Aguilar) was fully advised of his constitutional rights per <u>Miranda</u> and any statements made by him are not subject to suppression.

IV.  RECOMMENDATION

Based on the foregoing, the Court HEREBY RECOMMENDS that Defendants' Motion to Suppress be DENIED.

Copies of the foregoing report and recommendation are being mailed to all parties who are hereby notified of their right to object.  The parties must file any objection to the Report and Recommendation within ten days after receiving it.  Failure to object may constitute a waiver of objections upon subsequent review.

DATED this  14th  day of March, 2006.


BY THE COURT:


_____
BROOKE C. WELLS
United States Magistrate Judge